## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMHITA GERA, derivatively on behalf of UIPATH, INC., | |
| Plaintiff, | **Case No.:** 1:24-cv-05157 |
| vs. | |
| DANIEL DINES, ROBERT ENSLIN, ASHIM GUPTA, PHILIPPE BOTTERI, MICHAEL GORDON, DANIEL SPRINGER, LAELA STURDY, KARENANN TERRELL, RICHARD P. WONG, and JUNE YANG | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| UIPATH, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Samhita Gera ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant UiPath, Inc. ("UiPath" or the "Company"), files this Verified Shareholder Derivative Complaint against Daniel Dines ("Dines"), Robert Enslin ("Enslin"), Ashim Gupta ("Gupta"), Philippe Botteri ("Botteri"), Michael Gordon ("Gordon"), Daniel Springer ("Springer"), Laela Sturdy ("Sturdy"), Karenann Terrell ("Terrell"), Richard P. Wong ("Wong"), and June Yang ("Yang") (collectively, the "Individual Defendants," and together with UiPath, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of UiPath, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange

Act of 1934 (the "Exchange Act"), and against Defendants Dines, Enslin, and Gupta for contribution under 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding UiPath, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by UiPath's controlling shareholder and current and/or former officers and directors from November 30, 2023 to May 29, 2024, both dates inclusive (the "Relevant Period").

2.      UiPath is a Delaware corporation founded in 2005 with principal executive offices in New York, New York. The Company develops robotic process automation ("RPA" or "Robots") software designed to automate high volume, repetitive digital tasks. This includes tasks such as moving documents into folders, clicking software applications, and filling in forms. The Company represents itself as being "at the forefront of technology innovation and thought leadership in automation." The Company also represents that its software is an "end-to-end" solution, meaning customers are allowed to utilize the software to build and create their own automations they may need for their specific circumstances.

3.      With the rapid development of artificial intelligence ("AI") technology capabilities in the last few years, the Company has striven to bolster its RPA offerings by utilizing AI-powered products.

4.      To this end, on September 27, 2022, UiPath announced a turnaround strategy to mitigate the declining demand for, and slow growth of, the Company's RPA products. The turnaround strategy involved rebranding the Company as an AI-powered Business Automation Platform and revamping UiPath's go-to-market sales strategy. The new sales strategy, among other things, involved UiPath (a) focusing on the sale of UiPath's platform of products, in contrast to permitting customers the option to choose single product offerings; and (b) expanding sales resources to the Company's biggest customers and prioritizing sales to customers' C-suites.

5.      Throughout the Relevant Period, the Individual Defendants represented that UiPath's Business Automation Platform "enables us [the Company] to close larger, more strategic deals" and that UiPath's AI-powered products "set us apart from the competition." Further, the Individual Defendants represented that UiPath had abandoned its go-to-market strategy and was actively "executing against that strategy, and we're seeing [the] results in the deal quality and the customer quality."

6.      The Individual Defendants further touted the potential and success of the turnaround strategy stating, "our strategic investments in innovations and our go-to-market ecosystem positions us well for continued momentum," and asserted that "there's no doubt there's [been] better execution" since launching the turnaround strategy.

7.      In reality, the Company's turnaround strategy was a failure. Unavailing investments and irregular execution hampered UiPath's answer to the Company's previous go-to-market sales strategy. Indeed, instead of generating a competitive advantage, the AI-powered Business

Automation Platform caused customer "confusion." UiPath also could not adequately scale the AI-powered Business Automation Platform either. Consequently, UiPath faced serious issues with closing and/or increasing large multiyear deals.

8.      On November 30, 2023, after the market closed, the Company filed a press release, disclosing its financial results for the third quarter ("Q3") of the 2024 Fiscal Year.[1] The press release indicated positive quarterly results, including revenue of $326 million, a 24% year-over-year increase, which the Individual Defendants claimed was due to the execution of the turnaround strategy.

9.      On this news, the Company's stock price increased from a close of $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023, representing an increase of almost 27%.

10.      On March 13, 2024, the Company filed a current report on Form 8-K with the SEC. The Form 8-K included as an exhibit a press release issued by the Company that same day (the "Q424 Press Release"), announcing its financial results for the fiscal fourth quarter ("Q4") and 2024 Fiscal Year.

11.      The Q424 Press Release announced a "[r]ecord quarterly revenue of $405 million" for Q4 of the 2024 Fiscal Year, a 31% increase year-over-year, and that UiPath achieved its "first quarter of GAAP profitability as a public company." Additionally, UiPath provided revenue guidance in the range of $1.555 billion to $1.560 billion for the 2025 Fiscal Year. The Individual

---

[1] UiPath's fiscal year does not mirror the calendar year but rather begins on February 1 and concludes on January 31 of each calendar year. For the period between February 1, 2023 to January 31, 2024 (the "2024 Fiscal Year"); and for the period between February 1, 2024 to January 31, 2025 (the "2025 Fiscal Year").

Defendants, in the Q424 Press Release, again touted the Company's supposed success, citing the execution of the turnaround strategy.

12.     On May 29, 2024, the Company revealed that Defendant Enslin abruptly resigned as Chief Executive Officer ("CEO"), effective June 1, 2024. The Company announced the departure in a Form 8-K which included as an exhibit a press release announcing that Defendant Dines would be reappointed as CEO following Defendant Enslin's resignation.

13.     That same day, the Company disclosed poor financial results for the first quarter of the 2025 Fiscal Year and substantially lowered its 2025 Fiscal Year guidance by 10%, or $150 million, within the range of $1.405 billion to $1.410 billion. The Company named "contract execution challenges on large deals," as well as an inadequate "execution strategy to scale" the Company's AI-powered growth products "to reach their full potential," as the main reasons for the disappointing financial results.

14.     The Company went on to reveal that "investments we have made to reaccelerate growth have fallen short of our expectations [and] made us less agile in responding to customer needs."

15.     In the Q424 Press Release, Defendant Dines indicated that the turnaround strategy had failed and instead, the Company would be switching gears stating, "[a]s we look to the future, we are laser focused on enhancing our execution . . ., driving higher efficiency across sales . . . and driving a deeper and more execution-oriented strategy for our [AI-powered] growth products." Defendant Dines went on to say that "[w]e are also shifting the way we engage with customers to reinvigorate our line of business engagement with an industry tailored approach" and "we plan to go back to our roots, building a truly customer-centric organization." Defendant Dines partially attributed the Company's performance to AI: "AI is creating a little bit of confusion with our

5

customers" and instead of closing deals, the customers are continuing to "evaluat[e] what kind of tasks are better suitable to automate the AI" and "what tasks are better with using our platform."

16.     On this news, the Company's stock price dropped $6.23 per share, or more than 34%, from closing at $18.30 per share on May 29, 2024, to close at $12.07 per share on May 30, 2024.

17.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (a) poor investments and irregular execution of the Company's new turnaround strategy caused it to fail; (b) UiPath's inability to adequately scale its AI-powered tools led to "confusion" amongst customers and weakened UiPath's AI-powered Business Automation Platform; (c) as a result, the Company faced significant issues with closing and/or expanding lucrative multiyear deals; and (d) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

18.     The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material facts, while, during the Relevant Period, two of the Individual Defendants sold Company shares at artificially inflated prices for combined total proceeds of approximately $14,734,272.

19.     Additionally, the Individual Defendants caused the Company substantial harm by causing it to repurchase its own shares at artificially inflated prices. In total, the Company spent an aggregate amount of ***over $44,000*** to repurchase approximately 1,889 shares of its own common

stock at artificially inflated prices from April 2021 to September 2022. In total, this caused the Company to overpay for repurchases of its own stock by $20,464.

20.     In light of the Individual Defendants' misconduct—which has subjected the Company, its controlling shareholder, its former CEO, its current CEO, and its Chief Financial Officer ("CFO") to a securities class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the

Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f) and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, UiPath is headquartered in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of UiPath. Plaintiff has continuously held UiPath common stock since the time of the alleged wrongdoing.

### Nominal Defendant UiPath

27.     UiPath is a Delaware corporation with principal executive offices at One Vanderbilt Avenue, 60th Floor, New York, New York 10017. UiPath's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PATH."

### Defendant Dines

28.     Defendant Dines is the co-founder and current CEO of the Company. Additionally, he has served as Chairman of the Board since October 2005. Previously, he served as Chief Innovation Officer ("CIO") from January 31, 2024 to May 31, 2024. Moreover, from May 2022 to May 2024, he served as Co-CEO of the Company and was reappointed to the position of CEO

following former Company CEO, Defendant Enslin's, resignation. Additionally, Defendant Dines served as the Company's CEO from 2015 to 2022.  According to the Schedule 14A the Company filed with the SEC on May 9, 2024 (the "2024 Proxy Statement"), as of April 26, 2024, Defendant Dines beneficially owned 27,011,840 shares of Class A Common Stock, representing 5.5% of all of the Company's Class A Common Stock issued. Additionally, as of that date, Defendant Dines beneficially owned 82,452,748 shares of Class B Common Stock, representing 100% of all Class B Common Stock issued. Defendant Dines's ownership grants him 86.3% of total voting power at the Company, making him the controlling shareholder of UiPath. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 26, 2024, was $19.46, Defendant Dines owned approximately $525.7 million worth of UiPath stock as of that date.

29. For the 2024 Fiscal Year, Defendant Dines received $725,997 in total compensation from the Company. This included $6,017 in base salary and $719,980 in all other compensation. For the 2023 Fiscal Year, Defendant Dines received $771,835 in total compensation from the Company. This included $6,017 in base salary and $765,818 in all other compensation.

30. The 2024 Proxy Statement stated the following about Defendant Dines:

Mr. Dines is our Co-Founder and became our Chief Innovation Officer as of February 1, 2024. Previously, he served as our Co-Chief Executive Officer from May 2022 and, prior to that, as our Chief Executive Officer since our founding. Mr. Dines was a software development engineer at Microsoft Corporation. Mr. Dines holds a M.S. from the University of Bucharest. We believe that Mr. Dines is qualified to serve on our board of directors because of his leadership in conceptualizing and developing our brand and business, his software development expertise, and his extensive knowledge of our industry.

**Defendant Enslin**

31. Defendant Enslin served as CEO and Company director from February 2024 to June 2024. Previously, he served as Co-CEO from May 2022 through January 31, 2024. He then served as Company CEO from February 2024 to May 2024, prior to his resignation, effective June

1, 2024. According to the 2024 Proxy Statement, as of April 26, 2024, Defendant Enslin beneficially owned 2,363,383 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 26, 2024, was $19.46, Defendant Enslin owned approximately $46 million worth of UiPath stock as of that date.

32.     For the 2024 Fiscal Year, Defendant Enslin received $16,504,656 in total compensation from the Company. This included $750,000 in base salary, $15,063,554 in stock awards, $675,000 in non-equity incentive plan compensation, and $16,102 in all other compensation. For the 2023 Fiscal Year, Defendant Enslin received $54,055,629 in total compensation from the Company. This included $531,250 in base salary, $34,095,445 in stock awards, $472,813 in non-equity incentive plan compensation, and $21,702 in all other compensation.

33.     The 2024 Proxy Statement stated the following about Defendant Enslin:

> Mr. Enslin is our Chief Executive Officer and Director as of February 1, 2024. Prior to that, Mr. Enslin served as our Co-Chief Executive Officer from May 2022 through January 31, 2024. Prior to joining us, Mr. Enslin most recently served as President, Cloud Sales at Google. Mr. Enslin joined Google in April 2019. Prior to that, he spent 27 years at SAP, most recently as President of its Cloud Business Group and as an executive board member. We believe that Mr. Enslin is qualified to serve on our board of directors because of his software and technology industry and product experience; cloud computing experience, management experience; and sales and marketing experience.

**Defendant Gupta**

34.     Defendant Gupta has served as the Company's CFO since November 2019. According to the 2024 Proxy Statement, as of April 26, 2023, Defendant Gupta beneficially owned 426,347 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 26, 2024, was $19.46, Defendant Gupta owned approximately $8.3 million worth of UiPath stock as of that date.

35.     For the 2024 Fiscal Year, Defendant Gupta received $8,341,002 in total compensation from the Company. This included $500,000 in base salary, $7,531,777 in stock awards, $292,500 in non-equity incentive plan compensation, and $16,725 in all other compensation. For the 2023 Fiscal Year, Defendant Gupta received $15,646,662 in total compensation from the Company. This included $500,000 in base salary, $14,847,090 in stock awards, $289,250 in non-equity incentive plan compensation, and $10,322 in all other compensation.

36.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Gupta made the following sales of Company stock:

| Date | Shares | Average Price Per Share | Value |
| --- | --- | --- | --- |
| December 4, 2023 | 52,000 | $24.88 | $1,293,552 |
| December 15, 2023 | 52,000 | $25.65 | $1,333,748 |
| January 4, 2024 | 141,000 | $22.59 | $3,185,613 |
| January 8, 2024 | 70,000 | $23.02 | $1,611,119 |
| March 15, 2024 | 16,000 | $22.84 | $365,376 |
| April 4, 2024 | 56,000 | $21.66 | $1,212,792 |
| May 6, 2024 | 56,000 | $19.79 | $1,108,072 |
| **Total:** | **443,000** | | **$10,110,272** |

Thus, in total, before the fraud was exposed, he sold 443,000 shares of Company stock on inside information, for which he received approximately $10,110,272 in proceeds. His insider sales, made

with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

37.     The 2024 Proxy Statement stated the following about Defendant Gupta:

Mr. Gupta has served as our Chief Financial Officer since November 2019 and served as our Chief Customer Success Officer from February 2018 to November 2019. Prior to joining UiPath, Mr. Gupta served in various roles at General Electric Company from January 2000 to February 2018, including most recently as Senior Vice President and Chief Information Officer for Finance and Global Operations from March 2016 to February 2018, and as Chief Financial Officer of GE Water from August 2013 to March 2016. Mr. Gupta holds a B.A. from Rutgers University.

**Defendant Botteri**

38.     Defendant Botteri has served as a Company director since February 2020. As a member of the Board, Defendant Botteri serves on the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 26, 2024, Defendant Botteri beneficially owned 3,123,555 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 26, 2024 was $19.46, Defendant Botteri owned approximately $60.8 million worth of UiPath stock as of that date.

39.     For the 2024 Fiscal Year, Defendant Botteri received $251,156 in total compensation from the Company. This included $45,000 fees earned or paid in cash and $206,156 in stock awards. For the 2023 Fiscal Year, Defendant Botteri received $226,039 in total compensation from the Company. This included $45,000 in fees earned or paid in cash and $181,039 in stock awards.

40.     The 2024 Proxy Statement stated the following about Defendant Botteri:

Mr. Botteri serves, since June 2011, in various senior roles and as a Partner at Accel, a venture capital firm, where he focuses on investments in early and growth stage technology companies, including cloud applications, enterprise security, and online marketplaces. Mr. Botteri currently holds directorships and management positions for several Accel entities and other private companies. Mr. Botteri served on the board of directors of Fiverr International Ltd., an online marketplace for

freelance services, from 2016 through 2023. Mr. Botteri holds a M.A. from Ecole Polytechnique and Ecole des Mines in France. We believe that Mr. Botteri is qualified to serve on our board of directors because of his global experience; financial expertise; software and technology industry and product experience; and cloud computing experience.

**Defendant Gordon**

41.     Defendant Gordon has served as a Company director since September 2020. He also serves as Chair of the Audit Committee. According to the 2024 Proxy Statement, as of April 26, 2024, Defendant Gordon beneficially owned 142,379 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 26, 2024, was $19.46, Defendant Gordon owned approximately $2.8 million worth of UiPath stock as of that date.

42.     For the 2024 Fiscal Year, Defendant Gordon received $261,156 in total compensation from the Company. This included $55,000 in fees earned or paid in cash and $206,156 in stock awards. For the 2023 Fiscal Year, Defendant Gordon received $226,039 in total compensation. This included $45,000 in fees earned or paid in cash and $181,039 in stock awards.

43.     The 2024 Proxy Statement stated the following about Defendant Gordon:

Mr. Gordon serves, since July 2015, as Chief Financial Officer of MongoDB, Inc., a database platform company, and as its Chief Operating Officer since November 2018. Prior to joining MongoDB, Inc., Mr. Gordon worked at Yodle, Inc., an online marketing company, where he served as the Chief Financial Officer from May 2009 until July 2015 and as the Chief Operating Officer and Chief Financial Officer from March 2014 until July 2015. Prior to joining Yodle, Mr. Gordon was a Managing Director in the media and telecom investment banking group at Merrill Lynch, Pierce, Fenner and Smith Incorporated, a financial services company, where he worked from 1996 to 2009. Mr. Gordon received an A.B. from Harvard College and a MBA from Harvard Business School. We believe that Mr. Gordon is qualified to serve on our board of directors because of his global experience; financial expertise; software and technology industry and product experience; and cloud computing experience.

**Defendant Springer**

44.     Defendant Springer has served as a Company director since March 2021. Defendant Springer also serves as a member of the Compensation Committee and the Audit Committee. According to the 2024 Proxy Statement, as of April 26, 2024, Defendant Springer beneficially owned 86,905 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 26, 2024, was $19.46, Defendant Springer owned approximately $1.7 million worth of UiPath stock as of that date.

45.     For the 2024 Fiscal Year, Defendant Springer received $263,122 in total compensation from the Company. This included $56,966 in fees earned or paid in cash and $206,156 in stock awards. For the 2023 Fiscal Year, Defendant Springer received $226,039 in total compensation from the Company. This included $45,000 in fees earned or paid in cash and $181,039 in stock awards.

46.     The 2024 Proxy Statement stated the following about Defendant Springer:

Mr. Springer served, from January 2-17 to June 2022, as Chief Executive Officer, President, and director of DocuSign, Inc., an e-signature technology company. Mr. Springer continues to serve as a director of DocuSign. From May 2015 to January 2017, he served as an Operating Partner at Advent International Corp., a private equity investment firm. From March 2014, Mr. Springer served as Chairman and Chief Executive Officer of Responsys, Inc., a marketing software company that was acquired by Oracle Corp. in 2014. Mr. Springer previously served on the board of directors of YuMe Inc., a digital advertising company, from October 2013 to July 2017. Mr. Springer holds a B.A. from Occidental College and a MBA from Harvard University. We believe that Mr. Springer is qualified to serve on our board of directors because of his experience as a public company CEO; financial expertise; software and technology industry and product experience; cloud computing experience; management experience; and sales and marketing experience.

**Defendant Sturdy**

47.     Defendant Sturdy has served as a Company director since March 2021. Defendant Sturdy also serves as a member of the Nominating and Corporate Governance Committee. From November 2018 to March 2021, Defendant Sturdy served as a board observer. According to the

2024 Proxy Statement, as of April 26, 2024, Defendant Sturdy beneficially owned 34,392 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 26, 2024 was $19.46, Defendant Sturdy owned approximately $669,268 worth of UiPath stock as of that date.

48.     For the 2024 Fiscal Year, Defendant Sturdy received $263,122 in total compensation from the Company. This included $56,966 in fees earned or paid in cash and $206,156 in stock awards. For the 2023 Fiscal Year, Defendant Sturdy received $233,539 in total compensation from the Company. This included $52,500 in fees earned or paid in cash and $181,039 in stock awards.

49.     The 2024 Proxy Statement stated the following about Defendant Sturdy:

Ms. Sturdy serves, since March 2023, as Managing Partner of CapitalG LP, the late-stage growth venture capital fund financed by Alphabet Inc. Ms. Sturdy served as a General Partner of CapitalG LP from October 2013 to February 2023. Previously, Ms. Sturdy held several roles at Google LLC, including Managing Director, Emerging Businesses, Sales and Business Operations from March 2010 to October 2013. Ms. Sturdy currently serves on the Board of Duolingo, Inc. and previously served on the board of directors of Care.Com, Inc. and she is also a director of several private companies. Ms. Sturdy holds an A.B. in biochemistry from Harvard College, a M.S. from Trinity College Dublin and a MBA from Stanford University. We believe that Ms. Sturdy is qualified to serve on our board of directors because of her financial expertise; software and technology industry and product experience; cloud computing experience; management experience; and sales and marketing experience.

**Defendant Terrell**

50.     Defendant Terrell has served as a Company director since April 2023. According to the 2024 Proxy Statement, as of April 26, 2024, Defendant Terrell beneficially owned 23,341 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 26, 2024, was $19.46, Defendant Sturdy owned approximately $454,216 worth of UiPath stock as of that date.

51.     For the 2024 Fiscal Year, Defendant Terrell received $811,088 in total compensation from the Company. This included $36,784 in fees earned or paid in cash and $774,304 in stock awards.

52.     The 2024 Proxy Statement stated the following about Defendant Terrell:

Ms. Terrell most recently served as Chief Digital and Technology Officer of GlaxoSmithKline Plc from September 2017 through December 2021. Prior to that. Ms. Terrell served as the Chief Information Officer of Walmart Inc. from 2010 through 2017. Ms. Terrell served on the board of Pluralsight, Inc., from 2017 through 2021. Ms. Terrell received a B.S. in Electrical Engineering from Kettering University and a M.S. in Electrical Engineering from Purdue University. We believe Ms. Terrell is qualified to serve on our board of directors because of her broad IT and digital experiences spanning several industries.

**Defendant Wong**

53.     Defendant Wong has served as a Company director since March 2018. Defendant Wong also serves as Chair of the Compensation Committee. According to the 2024 Proxy Statement, as of April 26, 2024, Defendant Wong beneficially owned 11,760,132 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 26, 2024, was $19.46, Defendant Wong owned approximately $228.9 million worth of UiPath stock as of that date.

54.     For the 2024 Fiscal Year, Defendant Wong received $267,420 in total compensation from the Company. This included $61,264 in fees earned or paid in cash and $206,156 in stock awards. For the 2023 Fiscal Year, Defendant Wong received $241,039 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $181,039 in stock awards.

55.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Wong, personally, made the following sales of Company stock:

| Date | Shares | Average Price Per Share | Value |
|---|---|---|---|
| January 8, 2024 | 200,000 | $23.12 | $4,624,000 |
| **Total:** | **200,000** | | **$4,624,000** |

Thus, in total, before the fraud was exposed, he sold 200,000 shares of Company stock on inside information, for which he received approximately $4,624,000 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

56.     The 2024 Proxy Statement stated the following about Defendant Wong:

Mr. Wong has served as a member of our board of directors since March 2018. Mr. Wong serves, since November 2006, as a General Partner at Accel. From January 2001 to November 2006, Mr. Wong held a number of executive roles at Openwave Systems Inc., a mobile software company, including Senior Vice President of Products and Chief Marketing Officer. Mr. Wong serves on the boards of directors of Atlassian Corporation Plc, a software development tool company, since July 2010, and a number of other private companies. Mr. Wong also served on the board of directors of Sunrun Inc., a solar energy company, from July 2009 to March 2018. Mr. Wong holds a B.S. and a M.S. from the Massachusetts Institute of Technology. We believe that Mr. Wong is qualified to serve on our board of directors because of his global experience, financial expertise, software, technology industry and product experience, and cloud computing experience.

**Defendant Yang**

57.     Defendant Yang has served as a Company director since February 2024.

58.     The 2024 Proxy Statement stated the following about Defendant Yang:

Ms. Yang has served in executive roles at multiple Fortune 500 companies. Most recently, she was Vice President, Cloud AI and Industry Solutions at Google Cloud from 2021 to 2023. Prior to that she worked as Vice President and General Manager, Compute and Machine Learning Infrastructure at Google Cloud from 2019 to 2021. Ms. Yang held senior leadership roles at VMware from 2009 to 2019, and was at Oracle before that. Ms. Yang also serves on the Board of Directors at SRS Distribution, one of the largest and fastest growing building products distributors in the United States, and Cradles to Crayons, a nonprofit for children in need. Ms. Yang earned a M.S. in Management from Stanford University

Graduate School of Business, a M.S. in Chemical Engineering from the University of California, Berkeley, and a B.S. in Chemical Engineering from Caltech. We believe Ms. Yang is qualified to serve on our board of directors given her global experience; software and technology industry and product experience; cloud computing experience; and management experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

59.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of UiPath and because of their ability to control the business and corporate affairs of UiPath, the Individual Defendants owed UiPath and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage UiPath in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of UiPath and its shareholders so as to benefit all shareholders equally.

60.     Each controlling shareholder, director and officer of the Company owes to UiPath and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

61.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of UiPath, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

62.     To discharge their duties, the controlling shareholder, officers, and directors of UiPath were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

63.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest

fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of UiPath, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of UiPath's Board at all relevant times.

64.     As controlling shareholder, senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, including Defendant Dines as a controlling shareholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

65.     To discharge their duties, the controlling shareholder, officers, and directors of UiPath were required to exercise reasonable and prudent supervision over the management,

policies, practices, and internal controls of the Company. By virtue of such duties, the officers, and directors of UiPath were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to UiPath's own Global Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how UiPath conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of UiPath and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that UiPath's operations would comply with all applicable laws and UiPath's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.     Each of the Individual Defendants further owed to UiPath and the shareholders the duty of loyalty requiring that each favor UiPath's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

67.     At all times relevant hereto, the Individual Defendants were the agents of each other and of UiPath and were at all times acting within the course and scope of such agency.

68.     Because of their advisory, executive, managerial, directorial, and controlling positions with UiPath, each of the Individual Defendants had access to adverse, non-public information about the Company.

69.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by UiPath.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

70.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

72.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of UiPath was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

74.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of UiPath and was at all times acting within the course and scope of such agency.

## UIPATH'S CODE OF CONDUCT

75.     UiPath's Code of Conduct "is applicable to all employees, freelancers, those employed by carriers or other contingent workers acting on Behalf of UiPath ["UiPathers"], as well as the Company's business partners."

76.     The Board represents that it adopted the Code of Conduct to "ensure that at all times all employees, freelancers, those employed by carriers or other contingent workers acting on behalf of UiPath or having access to UiPath systems including its subsidiaries and affiliates… act in good faith, with integrity and consistent with the Company's values in order to maintain effective trust and credibility with our employees, customers, business partners and communities in which we operate."

77.     In a section titled "Speak Up," the Code of Conduct states, "If you become aware of any circumstances that you have a good faith reason to believe are inconsistent with or in violation of this Code of Conduct, you have a responsibility to report such conduct[.]"

78.     In a section titled "Financial Disclosures," the Code of Conduct states the following, in relevant part:

> UiPath is required to maintain accurate financial books and records reflecting the true nature of UiPath's operations and finances. Falsification of company business documents is expressly prohibited. Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee of the Board, or by raising the concern on the Compliance Hotline as described below under the "Speak Up" section.

79.     In a section titled "Avoid Conflicts of Interest," the Code of Conduct states the following, in relevant part:

UiPathers shall not engage in any conflicts of interest stemming from any personal activities or relationships that influence or may be perceived to influence one's decision-making and ability to work in the best interests of UiPath. UiPathers must disclose, amongst other things, personal financial interests or investments, personal relationships, outside employment or engagements, membership in professional and political organizations, as well as excessive gifts or hospitalities.

80.     In a section titled "Disclosure of Inside Information," the Code of Conduct states

the following:

As a UiPather, you may be privy to confidential information of UiPath or its customers or partners that may provide you or anyone to whom you disclose such information an unfair financial advantage as it pertains to the purchasing or selling of equity in such companies. The use of such inside information with respect to purchasing or selling equity is unlawful and may lead to civil and/or criminal liability.

81.     In a section titled "Compliance with the Law," the Code of Conduct states the

following, "All UiPathers, as well as its business partners, are expected at all times to strictly obey

all applicable laws and regulations."

## CORPORATE GOVERNACE GUIDELINES

82.     The Company also maintains Corporate Governance Guidelines. The Corporate

Governance Guidelines state the following, in relevant part, about the responsibilities of the Board:

A director should discharge his or her duties, including duties as a member of any committee on which he or she serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company and its stockholders. Board members will comply with the laws and requirements of the Exchange and other applicable regulatory agencies and with all policies and guidelines of the Company, including without limitation, the Company's Global Code of Conduct.

Each director is expected to disclose promptly to the Board and respond promptly and accurately to periodic questionnaires or other inquiries from the Company regarding any existing or proposed relationships with the Company, including compensation and stock ownership, which could affect the independence of the director. Each director will also promptly inform the Board of any material change in such information, to the extent not already known by the Board.

Board members are expected to devote sufficient time and attention to prepare for, attend, and participate in Board meetings and meetings of committees on which

they serve, including advance review of meeting materials that may be circulated prior to each meeting…[.]

83.     Additionally, the Corporate Governance Guidelines emphasize that the Board must

not utilize confidential information for personal benefit, stating the following:

> Directors may not use such confidential information for personal benefit or to benefit other persons or entities other than the Company. Unless authorized by the Company or applicable law, directors will refrain from disclosing confidential information to anyone outside the Company, especially anyone affiliated with any entity or person that employs the director or has sponsored the director's election to the Board. These obligations continue even after service on the Board has ended. The confidentiality obligations described above continue even after service on the Board has ended. Any questions or concerns about potential disclosures should be directed to the Company's General Counsel and Chief Legal Officer, who then may communicate with the Chief Executive Officer(s) or the Nominating Committee regarding the potential disclosures.

84.     In a section titled "Role of the Board of Directors," the Corporate Governance

Guidelines state:

> Stockholders select directors to provide oversight and strategic guidance to senior management. A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Board service requires significant time and attention. More specifically, the Board has responsibilities to review, approve, and monitor fundamental financial and business strategies and significant corporate actions, assess the Company's major risks, and consider ways to address those risks, select and oversee management, and establish and oversee processes to maintain the Company's integrity. To fulfill their duties, directors must prepare for meetings and discussions with management, participate in Board meetings, review relevant materials, and serve on committees. The Company expects directors to maintain an attitude of constructive involvement and oversight, ask relevant and incisive questions, and demand honest and accurate answers. Directors must act with integrity and demonstrate a commitment to the Company, the Company's values, business, and long-term stockholder value.

85.     In violation of the Code of Conduct and the Corporate Governance Guidelines, the

Individual Defendants (as controlling shareholder, key officers and members of the Company's

Board) conducted little, if any, oversight of the Company's engagement in the Individual

Defendants' scheme to issue materially false and misleading statements to the public, and to

facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), 20(a), and Rule 10b-5 promulgated thereunder of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Moreover, two of the Individual Defendants violated the Code of Conduct by engaging in insider trading.

## AUDIT COMMITTEE CHARTER

86.     The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following about the Audit Committee's main objective:

> • oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;
> • manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");
> • maintain and foster an open avenue of communication with the Company's management, internal audit group and Auditors;
> • review any reports or disclosures required by applicable law and stock exchange listing requirements;
> • oversee the design, implementation, organization and performance of the Company's internal audit function;
> • help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and
> • provide regular reports and information to the Board.

87.     Under a section titled "Authority," the Audit Committee Charter states the following, in relevant part:

> The Committee will have access to all Company books, records, facilities and personnel as deemed necessary or appropriate by any member of the Committee. If the Committee concludes that it must retain legal, accounting or other outside advisors, it may do so and determine compensation for those advisors at the

Company's expense. The Committee may also pay any ordinary administrative expenses it deems appropriate in carrying out its duties at the expense of the Company. The Committee will have authority to require that any of the Company's personnel or outside advisors attend any meeting of the Committee or meet with any member of the Committee or any of its advisors.

88.     In violation of the Audit Committee Charter, Defendants Gordon and Springer failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

### THE INDIVIDUAL DEFENDANTS' MISCONDUCT

*Relevant Background*

89.     UiPath is a global software company that produces RPA software designed to automate repetitive digital tasks for offices and businesses. Defendant Dines originally founded the Company in Bucharest, Romania in 2005.

90.     Throughout 2022, the Company experienced slow development and decreasing demand for its RPA products. As a result, during an Investor Day conference call held on September 27, 2022 ("2022 Conference Call"), the Company reported it would be implementing a new turnaround strategy to mitigate the Company's financial decline. This would involve revamping the UiPath's go-to-market strategy and presenting UiPath as an AI-powered Business Automation Platform.

91.     The turnaround strategy's implementation involved making AI the focal point of the Company's business automation offerings. The Company utilizes intelligent document processing ("IDP") as one of the main tools provided by its platform. IDP uses AI-based technologies to carry out various administrative tasks, such as scanning, reading, and organizing

information in documents. The AI-powered tools provided by the Company's platform, including IDP, are known as the Company's "growth products."

92.     In shifting its marketing strategy, the Company implemented a new platform sales model that focused on selling a large suite of the Company's products, as opposed to offering individual products to customers. Instead, the Company would establish new pricing tiers that provide access to its platform. The new platform sales model allowed customer access to an array of UiPath's products for one price to encourage the sale of multiple Company products and thus accelerate growth.

93.     Revamping the Company's market strategy also involved an initiative to customize UiPath's sales strategy to its various customers. To tailor the sales strategy, the Company created three customer segments based on customer size – Enterprise, Corporate/Mid-Market, and Small and Medium Businesses – to facilitate proper and efficient sales strategies for each of the customer types.

94.     Throughout the 2022 Conference Call, the Company's Chief Business Officer, Chris Weber, explained that the Company's new sales strategy aimed to accelerate sales growth in various ways, including prioritizing sales to enterprise customers by "focus[ing] a higher density of resources" on enterprise customers "who represent the highest propensity." Weber went on to state that the Company would "double down on the verticals that have the highest propensity and give us the best chance to accelerate growth" and "structure our sales teams around these verticals," particularly, banking, financial services, health care, public sector, and manufacturing.

95.     That same day, the Company's Chief Business Officer introduced the Company's new value-based selling tool called "NorthStar." Chris Weber explained that "what it allows us to do is we use external data from [firms] like McKinsey that will say by industry and by department,

what is the total potential automation capability" of a specific customer to help optimize sales opportunities during conversations between the Company's sales representative and customers.

96.     On December 1, 2022, UiPath hosted its Q3 2023 Fiscal Year earnings call, where Defendant Enslin described NorthStar as a "prescriptive and predictive model [that] helps our sales reps position the value of automation to customers through an engagement framework that defines economic value, the execution road map and best practices. It is a great tool to clearly position the differentiated long-term benefits of automation delivered through our platform capabilities."

## FALSE AND MISLEADING STATEMENTS

### November 30, 2023 Press Release

97.     After the market closed on November 30, 2023, the Company issued a press release highlighting the Company's strong financial results for Q3 of its 2024 Fiscal Year (the "Q324 Press Release"). The Q324 Press Release stated that the Company had achieved revenues of $326 million during Q3 which was representative of a 24% year-over-year increase.

98.     In the Q324 Press Release, Defendant Enslin emphasized "the team's execution and the transformational results we deliver," and Defendant Gupta discussed the Company's business plan stating "[g]iven the strength of our business model we expect to balance growth and profitability, while investing in the business to position UiPath for long-term success."  In the Q324 Press Release, Defendant Dines touted the success of the Company's new platform stating, "[o]ur unwavering commitment to understanding the needs of our customers is key to our success. In our most recent platform release, 2023.10, we delivered scores of new capabilities that seamlessly translate the potential of AI into tangible action, accelerate productivity, spark innovation, and drive business outcomes for our customers."

### November 30, 2023 Earnings Call

99.     That same day, after markets closed, the Company held its Q3 and 2024 Fiscal Year earnings call (the "Q324 Earnings Call"). On the call, Defendant Enslin continued to emphasize the benefits of utilizing the new strategy, stating:

> Our third quarter results underscore the compelling value our end-to-end automation platform delivers for our customers and the strength of our business model . . . As many of you know, at the beginning of this fiscal year, we pivoted our go-to-market resources towards organizations that have a meaningful runway to invest in enterprise automation over the long term. This investment has significantly increased our presence in the C-suite and helped raise our profile with partners of all sizes.

100.     During the Q324 Earnings Call, Defendant Enslin partially attributed the success of the turnaround strategy to the Company's AI-powered platform and growth products, in addition to its tool, the NorthStar, stating:

> [W]e feel really good about how our teams are adopting all the changes that we've made and how they're connecting with customers and the relationships we're having with customers. The expansion is really, in many ways, driven through our growth products. With all the AI communication that's happening in the market, it allows us to have meaningful conversations with customers. They see why the platform is relevant. And then, as I said earlier on, we've been driving NorthStar quite a bit in showing where customers can really look at processes and tasks and understand how to drive value with the automation platform. . . . We believe that AI-powered automation is really helping digital transformation with our customer base and our larger customers.

101.     As the Q324 Earnings Call continued, Morgan Stanley analyst Theodor Johann Thun questioned the Company's utilization of AI-powered tools:

> [Y]ou're one of the few companies that's sort of uniquely positioned between traditional automation and generative AI technologies. Where do you see customers kind of take the dollars from when they're spending on these AI technologies, whether that's within the product areas that you offer or, more broadly, anything that's kind of coming out of your customer conversations in terms of how spend is getting reallocated in light of AI?

102.     Defendant Enslin replied by attributing UiPath's success to revamping its go-to-market strategy and "the business case we were able to drive with C-level suits," stating:

[W]hen customers are looking at spending with us and the AI story and AI to automation connection really fits well to what customers want to invest. And in many cases, the investments are coming out of the business case and business value that we produce in NorthStar and are able to show the efficiencies in how to gain so they can invest in innovation. And they see us as an innovation leader today with AI and innovation, combined with our AI-powered platform. . . . I feel it's really driven by the business case we were able to drive with C-level suites and how we focus on industry solutions and how we've connected those to the buying cycle with customers.

103.    Later in the Q324 Earnings Call, Defendant Dines explained that over time customers learned how to adopt AI technology for their business automation needs and now view the Company's platform as a way to "harness the power of AI" for automation:

I think that direction in the market that we are seeing right now around autonomous agents prove a bit our approach that always said that AI plus automation is the thing that drives the biggest outcomes for our customers. Actually, this is what we are seeing. A lot of our customers, after the initial little bit of a pause around how AI is going to help me with my automation, they realize that they need [a] powerful automation platform in order to harness the power of AI.

104.    Furthermore, during the Q324 Earnings Call, Defendant Gupta emphasized the success of the Company's investments in its new turnaround strategy, stating they were delivering the "right returns" and that UiPath was keenly monitoring those investments:

[W]e're investing in our frontline sales team and our sales capacity, and we'll continue to invest in areas where we see the right returns and the right investments. And Rob [Enslin] and the team looks at that on an ongoing basis and we do as a leadership team.

105.    Additionally, Defendant Gupta emphasized the successful sales efforts on companies' C-suites, stating:

The penetration and the sale of the platform . . . we continue to make really good progress on. And we see a very good strong performance in the enterprise segment, particularly in North America. A lot of the -- whatever headwinds we do see, we see really pronounced in the -- more pronounced in the lower end of the market. But overall, our strategy is on customers with a higher propensity to buy. We feel like we're executing against that strategy, and we're seeing that results in the deal quality and the customer quality in the quarter.

106.     Analysts positively reacted to the Company's Q3 2024 Fiscal Year financial results, including Frederick Havemeyer, an analyst from Macquarie. Havemeyer published a report on December 1, 2023 titled "FQ3/24: When a turnaround turns out well." D.A. Davidson analyst, Gil Luria, echoed Havemeyer's positive sentiments in his report published the same day titled, "Enterprise Alignment Bearing Fruit." In his report, Luria commented on UiPath's sales strategy stating, "[UiPath's] strategic bet, almost a year old, on driving value for big clients with the longest/broadest automation journeys is paying off."

107.     On this news, the price of the Company's stock increased from $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023, representing an increase of nearly 27% within one day.

### March 13, 2024 Press Release

108.     On March 13, 2024, the Company issued its Q424 Press Release, reporting a "Record quarterly revenue of $405 million," indicating an increase of 31% year-over-year. The Q424 Press Release also announced that the Company achieved its "first quarter of GAAP profitability as a public company."

109.     In the Q424 Press Release, Defendant Enslin, once again, emphasized the Business Automation Platform's vital role in the Company's success, stating:

> We delivered a strong close to the fiscal year . . . , underscoring the meaningful outcomes our Business Automation Platform delivers for our customers. The combination of UiPath's AI and automation is the strategic change enabler for our customers that makes any digital transformation easier and faster, while empowering customers to innovate, adapt more quickly, and grow.

### March 13, 2024 Earnings Call

110.     On March 13, 2024, the Company held an earnings call with investors to discuss its financial and operating results for Q4 2024 Fiscal Year (the "Q424 Earnings Call"). While on

the Q424 Earnings Call, Defendant Enslin announced the Company had a "strong close to the fiscal year" which "exceed[ed] our guidance," mainly due to the "demand for the depth and breadth of our platform and the team's focus on customer success."

111.    Later, during the Q424 Earnings Call, Defendant Enslin commented on the Company's investments in its revamped go-to-market strategy, stating "I am very pleased with the team's ongoing cost management and discipline around capital deployment, which focuses our energy on the right initiatives and sets us up for future success."

112.    Defendant Enslin also discussed the Company's AI offerings, stating, "C-level executives are . . . prioritizing AI transformation" and "[o]ur business automation platform is the foundation to deliver the value across every organization. We make AI actionable, unlocking the promise of this next evolution in technology." He went on to tell investors that incorporating AI-powered growth products into UiPath's Business Automation Platform increased the Company's competitive viability and allowed it to "close larger, more strategic deals":

> 18 months ago, we drove the evolution of the automation market from RPA to a full AI-powered business automation platform. Our growth products have played a key role in our platform's evolution, setting us apart from the competition and serving as the link that connects AI and automation into actionable results. Our platform also enables us to close larger, more strategic deals.

113.    Defendant Enslin touted the "continued momentum" the Company was experiencing due to the turnaround strategy's success, claiming it was laying the foundation for future growth:

> [W]e delivered a strong close to the year, demonstrating the continued momentum of our AI-powered business automation platform. We're transforming industries and revolutionizing the way businesses operate. And as we look to 2025, I believe our strategic investments in innovations and our go-to-market ecosystem position us well for continued momentum.

114.    Ultimately, Defendant Enslin asserted that the revamping of the go-to-market strategy was a success:

> [T]here's no doubt there's better execution, right? There's no doubt that's what we said we wanted to achieve better execution. And we also wanted to make certain that the platform was relevant for C-level executives. And there's no doubt that the whole AI movement that's happened in the past 12 months, all of those pieces together has helped UiPath move forward in a dramatically better way.

115.    Analysts reacted positively to the Company's financial and operating results for Q4 2024 Fiscal Year, including Raimo Lenschow, a Barclays analyst who published a report on March 14, 2024 titled "UiPath continues to show better execution in a stable but dynamic macro environment." Additionally, Oppenheimer analyst Brian Schwartz published a report on March 14, 2024, in which he stated, "Management is executing well on its large customer growth and improving efficiency strategy, and the business is delivering better consistency in the quarterly results."

### 2024 Proxy Statement

116.    On May 9, 2024, the Company filed its 2024 Proxy Statement. Defendants Dines, Enslin, Gupta, Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang solicited the 2024 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

117.    The 2024 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) elect Defendants Dines, Enslin, Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang to the Board; (2) approve, on a non-binding advisory basis, executive compensation; and (3) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the fiscal year ending January 31, 2025.

118.    With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated:

We have adopted a Code of Conduct that applies to all employees, including executive officers, and to directors. The Code of Conduct is available on our website at *ir.uipath.com/governance/governance-documents*. If we ever were to amend or waive any provision of our Code of Conduct that applies to our principal executive officer, principal financial officer, principal accounting officer, or any person performing similar functions, or to any of our directors or other executive officers, we intend to satisfy our disclosure obligations, if any, with respect to any such waiver or amendment by posting such information on our website set forth above rather than by filing a Current Report on Form 8-K.

119.    Regarding the Role of the Board of Directors in Risk Oversight, the 2024 Proxy

Statement said:

Our board of directors, through its committees, oversees an enterprise-wide approach to risk management, designed to support the achievement of organizational objectives, improve long-term organizational performance, and enhance stockholder value. A fundamental part of risk management is not only understanding the most significant risks a company faces and what steps management is taking to manage those risks, but also understanding what level of risk is appropriate for a given company. The involvement of our full board of directors in reviewing our business is an integral aspect of its assessment of management's tolerance for risk and also its determination of what constitutes an appropriate level of risk.

While our full board of directors has overall responsibility for risk oversight, it has delegated oversight of certain risks to its committees. Our audit committee monitors our enterprise risk management program, major financial risk exposures, and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Furthermore, our audit committee monitors oversight of risks associated with cybersecurity, information security, and data privacy; our data security programs; and assessment, management, and mitigation of such risks. Further, our audit committee also monitors compliance with legal and regulatory requirements, in addition to overseeing the performance of our internal audit function. Our compensation committee monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our nominating and corporate governance committee oversees our major corporate governance risks, including through monitoring the effectiveness of our Corporate Governance Guidelines and oversight of the Company's ESG program.

In connection with its reviews of the operations of our business, our full board of directors addresses the primary risks associated with our business including, for example, strategic planning. Our board of directors appreciates the evolving nature of our business and industry and is actively involved in monitoring new threats and risks as they emerge. In particular, our board of directors has been closely

monitoring developments of new artificial intelligence ("AI") technologies and our competitive landscape as well as the global macroeconomic environment, its potential effects on our business, and risk mitigation strategies.

At periodic meetings of our board of directors and its committees, management reports to and seeks guidance from our board and its committees with respect to the most significant risks that could affect our business, such as legal risks, information security and privacy risks, and financial, tax, and audit-related risks. In addition, among other matters, management provides our audit committee periodic reports on our compliance programs and investment policy and practices.

120.    With regard to the Audit Committee's oversight responsibility, the 2024 Proxy Statement stated:

The principal duties and responsibilities of our audit committee include, among other things:
- selecting a qualified firm to serve as the independent registered public accounting firm to audit our financial statements and internal control over financial reporting;
- helping to ensure the independence and performance of the independent registered public accounting firm;
- helping to maintain and foster an open avenue of communication between management and the independent registered public accounting firm;
- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent registered public accounting firm, our interim and year-end operating results;
- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;
- overseeing the design, implementation, organization, and performance of the Company's internal audit function;
- reviewing our policies on risk assessment and risk management;
- reviewing related party transactions;
- overseeing the scope, design, adequacy, and effectiveness of our internal control over financial reporting and our disclosure controls and procedures; and
- pre-approving all audit    and    all permissible non-audit services to    be performed by the independent registered public accounting firm.

121.    Defendants Dines, Enslin, Gupta, Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) poor investments and irregular execution of the Company's new turnaround strategy

caused it to fail; (2) UiPath's inability to adequately scale its AI-powered tools led to "confusion" amongst customers and weakened UiPath's AI-powered Business Automation Platform; (3) as a result, the Company faced significant issues with closing and/or expanding lucrative multiyear deals; and (4) in breach of their fiduciary duties, the Company failed to maintain adequate internal controls. As a result, UiPath's public statements were materially false and misleading at all relevant times.

122. The 2024 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

123. As a result of Defendants Dines, Enslin, Gupta, Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to (1) reelect Defendants Dines, Enslin, Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang to the Board, allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on a non-binding advisory basis, executive compensation; and (3) ratify KMPG LLP as the Company's independent registered public accounting firm for the fiscal year ending January 31, 2025.

124. The statements identified in ¶¶ 97-100, 102-105, and 108-114 were materially false and/or misleading when made because they failed to disclose, *inter alia*, that:  Moreover, these statements were materially false and/or misleading when made because they failed to disclose that:

(a) poor investments and irregular execution of the Company's new turnaround strategy caused it to fail; (b) UiPath's inability to adequately scale its AI-powered tools led to "confusion" amongst customers and weakened UiPath's AI-powered Business Automation Platform; (c) as a result, the Company faces significant issues with closing and/or expanding grand multiyear deals; and (d) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### **THE TRUTH EMERGES**

#### *May 29, 2024 Press Release Announcing Resignation of CEO Enslin*

125.    The truth began to emerge after markets closed on May 29, 2024, when the Company issued a press release announcing the abrupt departure of Defendant Enslin as CEO, effective June 1, 2024, and the reappointment of Defendant Dines as CEO.

#### *May 29, 2024 Press Release Announcing Disappointing 1Q25 Results*

126.    That same day, the Company issued a separate press release revealing disappointing financial and operating results for the first quarter of the 2025 Fiscal Year, as well as a significant decrease in its revenue guidance for the 2025 Fiscal Year. The Company lowered its 2025 Fiscal Year revenue guidance by about 10%, or $150 million, decreasing from a range of $1.555 billion to $1.560 billion, to a range of $1.405 billion to $1.410 billion.

#### *May 29, 2024 Conference Call*

127.    On May 29, 2024, the Company also hosted a conference call (the "Q125 Conference Call") with analysts and investors to discuss UiPath's financial and operational results and guidance for the first quarter of the 2025 Fiscal Year ("Q125"). During the call, the Company initially presented that macroeconomic factors and delays in closing multi-year deals led to poor

results and reduced guidance for Q125. However, shortly after, Defendant Dines revealed the main

catalyst to be the failure of UiPath's turnaround strategy, stating:

> [W]e saw inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes, which we are working to rectify. While customer behavior is often a function of the broader macroeconomic environment, execution is something we can control. And we recognize that we need to improve predictability on large multiyear deals.

128.    Defendant Dines went on to disclose that "the investments we have made to

reaccelerate growth have fallen short of our expectations, made us less agile in responding to

customer needs and created short-term pressure on operating margins, all of which we are

committed to rectifying."

129.    Furthermore, Defendant Dines attributed the poor Q125 financial results and

reduced guidance to UiPath's inability to scale "our growth products such as IDP," noting that

"there is a need to have a deeper execution strategy to scale these products to reach their full

potential."

130.    Defendant Dines then noted the shortcomings of UiPath focusing its sales efforts

on customers' C-suites, in contrast to the previous touting of the Company's success in doing so,

stating:

> I think we went to a distance to go and pitch our business to C-level, which is actually great. But the reality is that we have to increase our adoption by taking care of our traditional line of business customers with the CIO suite, which I think, will benefit a lot more for a new reinvigorated customer-centric approach.

131.    Additionally, Defendant Dines revealed that the Company had failed to convince

customers that its AI-powered Business Automation Platform was effective and that the platform

had actually caused confusion.  When Chirag Haresh Ved, an analyst from Evercore ISI, asked,

"when you're thinking about large customers extending their cycles, are you seeing them stay on

the sidelines as they're reevaluating their gen AI strategies," Defendant Dines responded, in

relevant part, "I think that AI is creating a little bit of confusion with our customers. And they are evaluating what kind of tasks are better suitable to automate the AI, what tasks are better with using our platform."

132.    During the Q125 Conference Call, Defendant Gupta revealed that the Company had faced issues closing multiyear deals with various types of customers. For example, when analyst Bryan C. Bergin, from TD Cowen, asked, "as far as the deal scrutiny goes, the smaller deal sizes, the postponements, is that broad-based across the business," Defendant Gupta responded, "Bryan, it's broad-based. I don't think – it's not that we're zoned in on one particular area. So from a multiyear deal perspective, that's broad."

133.    Due to the Company's turnaround strategy ultimately failing, Defendant Dines revealed to investors that UiPath would be adopting a new turnaround strategy:

> As we look to the future, we are laser focused on enhancing our execution including improved sales linearity and deal scrutiny, driving higher efficiency across sales and the broader organization and driving a deeper and more execution-oriented strategy for our growth products. We are also shifting the way we engage with customers to reinvigorate our line of business engagement with an industry tailored approach. Lastly, we plan to go back to our roots, building a truly customer-centric organization, where co-innovating with our customers and partners is at the heart of everything we do.

134.    On this news, the price of the Company's stock fell from $18.30 per share on May 29, 2024 to $12.07 per share on May 30, 2024. This represented a decline of more than $6 per share, or more than 34%.

## **REPURCHASES DURING THE RELEVANT PERIOD**

135.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***approximately $44,000*** to repurchase approximately 1,889

shares of its own common stock at artificially inflated prices between January 2024 and April 2024.

136.    On March 27, 2024, the Company filed its 2024 10-K. According to the 2024 10-K, between January 1, 2024 and January 31, 2024, the Company purchased 951 shares of its common stock for approximately $21,274 at an average price of $22.37 per share.

137.    As the Company's stock was actually worth only $12.07 per share, the price at closing on May 30, 2024, the Company overpaid by approximately $9,795 for repurchases of its stock between January 1, 2024 and January 31, 2024.

138.    According to a Form 10-Q the Company filed with the SEC on June 3, 2024, for the quarterly period ended April 30, 2024 (the "Q1 24 Form 10-Q"), between February 1, 2024 and February 29, 2024, the Company purchased 673 shares of its common stock for approximately $15,842 at an average price of $23.54 per share.

139.    As the Company's stock was actually worth only $12.07 per share, the price at closing on May 30, 2024, the Company overpaid by approximately $7,719 for repurchases of its stock between February 1, 2024 and February 29, 2024.

140.    According to the Q1 24 Form 10-Q, between March 1, 2024 and March 31, 2024, the Company purchased 265 shares of its common stock for approximately $6,148 at an average price of $23.20 per share.

141.    As the Company's stock was actually worth only $12.07 per share, the price at closing on May 30, 2024, the Company overpaid by approximately $2,949 for repurchases of its stock between March 1, 2024 and March 31, 2024.

142.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $20,464.

## DAMAGES TO UIPATH

143.    As a direct and proximate result of the Individual Defendants' conduct, UiPath will lose and expend many millions of dollars.

144.    Such losses include over $20,464 the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

145.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

146.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

147.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

148.    As a direct and proximate result of the Individual Defendants' conduct, UiPath has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

149.    Plaintiff brings this action derivatively and for the benefit of UiPath to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of UiPath, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, for contribution under Section10(b) and Section 21D of the Exchange Act, and for violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and the aiding and abetting thereof.

150.    UiPath is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

151.    Plaintiff is, and has been at all relevant times, a shareholder of UiPath. Plaintiff will adequately and fairly represent the interests of UiPath in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

152.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

153.    A pre-suit demand on the Board of UiPath is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Dines, Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang (the "Director Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time of the filing of this complaint.

154.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and

misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $20,000 for repurchases of its own stock while one of them engaged in insider sales, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

155.    Demand in this case is further excused because Defendants Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang are beholden to and controlled by Defendant Dines, a primary interested wrongdoer who was, and still remains, a controlling shareholder of the Company.[2] As such, Defendant Dines controls their continued nomination to the Board. In light of this control, Defendants Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang cannot impartially consider a demand against Defendant Dines, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the compensation that goes with that. Thus, Defendants Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang are unable to evaluate a demand with disinterest or independence given Defendant Dines' control over them.

156.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director Defendants caused UiPath to issue false and misleading statements which were intended to make UiPath appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their

---

[2] According to the 2024 Proxy Statement, filed with the SEC on Schedule 14A on May 9, 2024, Defendant Dines exercises control over 86.3 % of UiPath's common stock.

fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

157.    Additional reasons that demand on Defendant Dines is futile follow. Defendant Dines is the Co-founder of the Company, current CEO, and has served as Chairman of the Board since October 2005. Moreover, from May 2022 to May 2024, he served as Co-CEO of the Company before being reappointed to CEO in June 2024. In addition, Defendant Dines holds over 86% of the voting power in the Company and is thus the controlling shareholder. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Dines with his principal occupation for which he receives handsome compensation. As CEO, Defendant Dines is ultimately responsible for all the Company's false and misleading statements and omissions made during the Relevant Period, including those which he made in press releases and in conference earnings call to investors and analysts. Defendant Dines also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director Defendants, which allowed them to continue to breach their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Further, Defendant Dines is a defendant in the Securities Class Action. For these reasons, Defendant Dines breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Botteri is futile follow. Defendant Botteri has served as a director of the Company since February 2020. Prior to serving as a director,

Defendant Botteri served as a board observer from April 2017 until his appointment. As a member of the Board, Defendant Botteri serves on the Nominating and Corporate Governance Committee. Additionally, Defendant Botteri has received and continues to receive handsome compensation for his role as a director, including $251,156 during the 2024 Fiscal Year and $226,039 during the 2023 Fiscal Year. Defendant Botteri also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director Defendants, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Botteri breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Gordon is futile follow. Defendant Gordon has served as a Company director since September 2020. As a member of the Board he serves as the Chair of the Audit Committee. Additionally, Defendant Gordon has received and continues to receive handsome compensation for his role as a director, including $261,156 during the 2024 Fiscal Year and $226,039 during the 2023 Fiscal Year. Defendant Gordon also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director Defendants, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded his duty to protect corporate assets. For these reasons, Defendant Gordon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Springer is futile follow. Defendant Springer has served as a Company director since March 2021. As a member of the Board, Defendant Springer serves on both the Compensation Committee and the Audit Committee. Defendant Springer has received and continues to receive handsome compensation for his role as a director, including $263,122 during the 2024 Fiscal Year and $226,039 during the 2023 Fiscal Year. Defendant Springer also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director Defendants, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Springer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Sturdy is futile follow. Defendant Sturdy has served as a Company director since March 2021. Previously, she served as board observer from November 2018 until her election to the board. As a member of the Board, Defendant Sturdy serves on the Nominating and Corporate Governance Committee. Defendant Sturdy has received and continues to receive handsome compensation for her role as a director, including $263,122 during the 2024 Fiscal Year and $ 206,156 during the 2023 Fiscal Year.

Defendant Sturdy also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director Defendants, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Sturdy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Terrell is futile follow.  Defendant Terrell has served as a Company director since April 2023. Defendant Terrell has received and continues to receive handsome compensation for his role as a director, including $811,088 during the 2024 Fiscal Year. Defendant Terrell also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director Defendants, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Terrell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

163.    Additional reasons that demand on Defendant Wong is futile follow. Defendant Wong has served as a Director of the Board since March 2018. As a member of the Board, Defendant Wong serves on the Compensation Committee. Defendant Wong has received and

continues to receive handsome compensation for his role as a director, including $267,420 during the 2024 Fiscal Year and $241,039 during the 2023 Fiscal Year. Additionally, during the Relevant Period Defendant Wong engaged in lucrative insider trading in which he sold 200,000 shares of Company common stock for over $4.6 million. Defendant Wong also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director Defendants, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Wong breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

164.    Additional reasons that demand on Defendant Yang is futile follow. Defendant Yang has served as a Director of the Board since February 2024. Defendant Yang also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director Defendants, which allowed them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Yang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

165.    Additional reasons that demand on the Board is futile follow.

166.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $20,000 for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

167.    Defendants Gordon and Springer served as members of the Audit Committee for the entirety of the Relevant Period. In violation of the Audit Committee Charter, Defendants Gordon and Springer failed to adequately review and discuss the Company's Forms 10-Q which contained materially false and misleading statements. Additionally, Defendants Gordon and Springer failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, Defendants Gordon and Springer further breached their fiduciary duties, are not disinterested or independent, and demand is futile, and therefore excused, as to them.

168.    In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code

of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

169.    UiPath has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for UiPath any part of the damages UiPath suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

170.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

171.    The acts complained of herein constitute violations of fiduciary duties owed by UiPath's officers and directors, and these acts are incapable of ratification.

172.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of UiPath. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of UiPath, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

173.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause UiPath to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

174.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

177.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

178.    Defendants Defendants Dines, Enslin, Gupta, Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (a) poor investments and irregular execution of the Company's new turnaround strategy caused it to fail; (b) UiPath's inability to adequately scale its AI-powered tools led to "confusion" amongst customers and weakened UiPath's AI-powered Business Automation Platform; (c) as a result, the Company faced significant issues with closing and/or expanding grand multiyear deals; and (d) in breach of their fiduciary duties, the Company failed to maintain adequate internal controls.

179.    The 2024 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the insider trading engaged in by two of the Individual Defendants.

180.    The false and misleading elements of the 2024 Proxy Statement led to the re-election of Defendants Dines, Enslin, Botteri, Gordon, Springer, Sturdy, Terrell, Wong, and Yang thereby allowing them to continue breaching their fiduciary duties to UiPath.

181.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

182.    Plaintiff on behalf of UiPath has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

183.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.    The Individual Defendants, by virtue of their positions with UiPath and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of UiPath and each of its controlling shareholder, officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause UiPath to engage in the illegal conduct and practices complained of herein.

185.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants participated in scheme to defraud with the purpose and effect of defrauding UiPath. Not only is UiPath now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon UiPath by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the

Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 1,889 of its own shares at artificially-inflated prices, damaging UiPath.

188.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

189.   The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about UiPath not misleading.

190.   The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by UiPath.

191.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from

them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

192.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

193.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

194.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of UiPath's business and affairs.

196.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

197.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of UiPath.

198.    In breach of their fiduciary duties owed to UiPath, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (a) poor investments and irregular execution of the Company's new turnaround strategy caused it to fail; (b) UiPath's inability to adequately scale its AI-powered tools led to "confusion" amongst customers and weakened UiPath's AI-powered Business Automation Platform; (c) as a result, the Company faced significant issues with closing and/or expanding grand multiyear deals; and (d) in light of the

above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

199.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

200.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

201.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $14 million.

202.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of UiPath's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

203.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

204.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UiPath has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

205.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Unjust Enrichment**

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, UiPath.

208.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from UiPath that was tied to the performance or artificially inflated valuation of UiPath or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

209.    Plaintiff, as a shareholder and a representative of UiPath, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

210.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Abuse of Control

211.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence UiPath, for which they are legally responsible.

213.   As a direct and proximate result of the Individual Defendants' abuse of control, UiPath has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, UiPath has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.   Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Individual Defendants for Gross Mismanagement

215.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of UiPath in a manner consistent with the operations of a publicly held corporation.

217.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, UiPath has sustained and will continue to sustain significant damages.

218.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

219.   Plaintiff, on behalf of UiPath, has no adequate remedy at law.

### EIGHTH CLAIM
**Against Individual Defendants for Waste of Corporate Assets**

220.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

222.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused UiPath to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

223.   In addition, the Individual Defendants caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

224.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

225.   Plaintiff, on behalf of UiPath, has no adequate remedy at law.

### NINTH CLAIM
**Against Defendants Dines, Enslin, and Gupta for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

226.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227.    UiPath, along with Defendants Dines, Enslin, and Gupta are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Dines, Enslin, and Gupta's willful and/or reckless violations of their obligations as controlling shareholder, officers and/or directors of UiPath.

228.    Defendants Dines, Enslin, and Gupta are, because of their positions of control and authority as controlling shareholder, officers and/or directors of UiPath, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of UiPath, including the wrongful acts complained of herein and in the Securities Class Action.

229.    Accordingly, Defendants Dines, Enslin, and Gupta are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

230.    As such, UiPath is entitled to receive all appropriate contribution or indemnification from Defendants Dines, Enslin, and Gupta.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of UiPath, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and

abetted the breach of their fiduciary duties to UiPath;

(c)     Determining and awarding to UiPath the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing UiPath and the Individual Defendants to take all necessary actions to reform and improve UiPath's corporate governance and internal procedures to comply with applicable laws and to protect UiPath and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of UiPath to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding UiPath restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 8, 2024

<div style="margin-left: 40%;">

**THE BROWN LAW FIRM, P.C.**

/s/__*Timothy Brown*_____
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
         shashmi@thebrownlawfirm.net

*Attorneys for Plaintiff*

</div>

DocuSign Envelope ID: 5B5F2E59-6E49-431A-9D32-C5947743BC03

## VERIFICATION

I, Samhita Gera, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3 day of July 2024.

DocuSigned by:

Samhita Gera